**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4483**

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

     v.

ERIC GORDON,

          Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.  (1:15-cr-00002-JFM-1)

Argued:  September 28, 2018              Decided:  November 7, 2018

Before WILKINSON and HARRIS, Circuit Judges, and William L. OSTEEN, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by unpublished opinion. Judge Osteen wrote the opinion, in which Judge Wilkinson and Judge Harris joined.

**ARGUED:**  Charles N. Curlett, Jr., LEVIN & CURLETT LLC, Baltimore, Maryland, for Appellant.  Judson T. Mihok, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:**  Steven H. Levin, Sarah F. Lacey, LEVIN & CURLETT LLC, Baltimore, Maryland, for Appellant.  Stephen M. Schenning, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

OSTEEN, JR., District Judge:

Eric Gordon ("Gordon") was convicted for his role in an embezzlement scheme masterminded by Gordon's friend and physical therapy patient, Saleh Stevens ("Stevens").

Gordon appeals his jury convictions for conspiracy to commit mail and wire fraud, conspiracy to launder money, and falsifying records in bankruptcy. Gordon's primary argument on appeal is that the district court erred by admitting pleadings from his separate but related civil bankruptcy proceeding that contained prejudicial hearsay. Gordon raises several other issues related to his trial and contends that the government improperly subpoenaed his bankruptcy attorney to testify before the grand jury.

We disagree with Gordon's arguments. With regard to the bankruptcy pleadings, we find that, even if the district court did err in admitting the pleadings, any such error was harmless. Therefore, we affirm Gordon's convictions.

## I.

### A.

Evidence produced and testimony given at trial showed the following. Gordon is a physical therapist who opened his own clinic in Maryland in 2009. J.A. 984.[1] Gordon obtained financing for his clinic from various outside sources: equity investments by friends and family, a substantial follow-on loan from an equity investor named Robert

---

[1] Citations herein to "J.A. _____" refer to the Joint Appendix filed by the parties in this matter.

DeSantis ("DeSantis") that was secured in part by Gordon's personal property, and a $240,000 loan from Stevens, a friend and former patient. J.A. 993–94, 998–99, 1050–52.

Stevens, a licensed attorney and bond claims adjustor for the Hanover Insurance Group ("Hanover"), also provided business and legal advice to Gordon. J.A. 492, 502–04, 512. Stevens began embezzling funds from Hanover in 2011 and ultimately stole approximately $3 million by funneling money reserved to pay project bond claims to personal bank accounts and to accounts and businesses controlled by close friends. J.A. 514–15, 518. Stevens was apprehended, pled guilty to fraud charges, and later testified against Gordon at Gordon's trial. J.A. 518–19.

Gordon was forced into bankruptcy in 2012 due to issues with his repayment of the DeSantis loan. J.A. 1053, 1068. Gordon's business entities and personal assets were the subject of a combined bankruptcy proceeding.[2] J.A. 170–71. Gordon filed a petition with the bankruptcy court listing all business and personal assets, J.A. 2195–2231, held meetings with his creditors, J.A. 171, and responded through his bankruptcy attorney to inquiries by the trustee, J.A. 2232, 2266. As addressed in more detail hereafter, the private trustee, individual debtors, and the U.S. Trustee's Office also filed adversary actions against Gordon as part of the bankruptcy proceeding. J.A. 783. Gordon responded to these allegations through his lawyer by filing answers, admissions, and responses to interrogatories. J.A. 267. Around this time, Gordon formed a new entity, RHSI, LLC

---

[2]  Gordon's bankruptcy was a Chapter 7 proceeding, in which a private trustee controls the debtor's assets pending disposition and the Assistant U.S. Trustee oversees the process and verifies the debtor's legal compliance. J.A. 775–78, 787.

4

("RHSI"), which he believed would enable him to continue his physical therapy business beyond the reach of creditors. J.A. 1059–60, 2177.

In August and September of 2012, Gordon and Stevens met on two occasions to discuss Gordon's need for additional financing to support Gordon's bid to receive funding from a multinational pharmaceutical company for a proposed physical therapy study. J.A. 541–45, 1081–82. During the first meeting, Stevens offered to obtain funds for Gordon; according to Stevens' testimony, he also told Gordon that they would need to keep the money "off the Government's radar screen" and that "moving the money wouldn't pass the smell test." J.A. 543–44. Gordon testified at his criminal trial and contended that Stevens never suggested the funds were illegitimate. J.A. 1082.

On September 20, 2012, Stevens directed a Hanover accountant to write two checks to RHSI, one for $265,892 and one for $279,983. J.A. 569–70. Stevens deposited these checks into an RHSI account with PNC Bank. J.A. 572, 1774–76. After receiving the deposit, Gordon wrote three checks at Stevens' instruction—two for $225,000 each to Jon Cohen (the owner of a NASCAR team that Stevens supported) and one for $60,000 to C.B. Lockhart (Stevens' law school friend)—and mailed these checks to Stevens. J.A. 574–75, 1086–88. Gordon converted the approximately $34,000 that remained from the initial deposit to his personal use. J.A. 1088–89.

Gordon initially failed to disclose RHSI bank statements from September 2012 to his creditors in the bankruptcy proceeding, which Gordon testified was due to difficulties obtaining the statements from PNC. J.A. 1111–14. This prompted both individual debtors and the trustees to file complaints, requests for admission, and interrogatories to determine

5

the nature and extent of post-bankruptcy transactions involving RHSI. J.A. 2266, 2454, 2472, 2477, 2571, 2621. Among other allegations, these pleadings accused Gordon and his business entities of misappropriating and converting collateral securing DeSantis' loan and using RHSI to improperly divert bankruptcy assets for personal use. J.A. 2298.

Gordon testified that the September 2012 transaction involving Stevens was a legitimate loan designed to prove to potential business partners that Gordon was well-capitalized. J.A. 1083, 1118. Gordon's bankruptcy attorney provided the Assistant U.S. Trustee with a copy of a bridge loan agreement between RHSI and XXXtreme Holdings, which Gordon stated was the operative document evincing the loan. J.A. 2051, 2134. The agreement was dated September 13, 2012, and was signed only by Gordon, on behalf of RHSI. J.A. 2051-61. Text messages and emails between Gordon and Stevens show that the document was created in the fall of 2013 and then back-dated. J.A. 1979–80. Contrary to what was reflected in the bridge loan agreement, the then-owner of XXXtreme Holdings, Jon Cohen, testified that he was not in the business of lending money and never made a loan to Gordon. J.A. 1213.

Gordon ultimately placed the Assistant U.S. Trustee in contact with Stevens, who explained that the money was a payment by RHSI to sponsor Cohen's NASCAR team. J.A. 622–23, 876–77. When the trustee inquired into the business sense of this arrangement, Stevens offered an additional, different account: the money represented a loan from Stevens to Gordon using funds provided by Hanover. J.A. 630, 878.

6

**B.**

On June 14, 2016, a grand jury indicted Gordon on charges of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), and falsification of records in bankruptcy in violation of 18 U.S.C. § 1519 and 18 U.S.C. § 2. J.A. 11 *et seq.*

Gordon's trial took place in Baltimore in March and April of 2017. Prior to trial, Gordon moved to dismiss the indictment due to the government's failure to notify defense counsel prior to subpoenaing Gordon's bankruptcy attorney to testify before the grand jury, in violation of an apparent promise made by a prior Assistant U.S. Attorney who had since left that position. J.A. 21, 97. The district court denied that motion. J.A. 115.

Immediately before trial, the government issued a Rule 404(b) notice stating that it intended to introduce as evidence Gordon's "responses to interrogatories, requests for admissions, and production of records" from his bankruptcy proceeding. J.A. 118 *et seq.* The government argued that this evidence was admissible or, in the alternative, that any potential prejudice could be avoided by a curative instruction to the jury. J.A. 127. Defense counsel objected to admission of the bankruptcy pleadings throughout trial. J.A. 264–66, 290, 765–67. The court overruled these objections, but gave multiple curative instructions of varying length and detail regarding the limited purpose for which the jury was to consider the pleadings. *See, e.g.*, J.A. 267, 352, 926.

At several points in the government's closing argument, the government suggested that Stevens told Gordon the money he could obtain was "tainted"; however, Stevens did

not use the word "tainted" in his own testimony. *Compare* J.A. 543–44, *with* J.A. 1673, 1676. Gordon's counsel did not object to these statements at trial.

The jury convicted Gordon of all three counts on April 7, 2017. Gordon moved for acquittal, or in the alternative, for a new trial, on April 21, 2017. J.A. 2883. The district court denied that motion. J.A. 2899. On July 11, 2017, the district court sentenced Gordon to thirty-six months of imprisonment. J.A. 2902.

Gordon now timely appeals, raising several alleged errors by the district court during his trial and an issue related to the grand jury proceedings that led to his indictment.

## II.

### A.

#### 1.

Gordon first argues that the district court improperly admitted into evidence voluminous pleadings from his civil bankruptcy case that contained hearsay.

We review the district court's decision to admit evidence at trial for abuse of discretion. *United States v. Medford*, 661 F.3d 746, 751 (4th Cir. 2011). We will uphold the district court's decision unless it "was arbitrary and irrational." *United States v. Weaver*, 282 F.3d 302, 313 (4th Cir. 2002).

We also review evidentiary rulings for harmless error. *Medford*, 661 F.3d at 751. An "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). An error is harmless if it did not affect the verdict. *Chapman v. California*, 386 U.S. 18, 23–24 (1967). As we have previously articulated, "if

8

the evidence is not merely sufficient, but so powerful, overwhelming, or cumulative that the error simply could not reasonably be said to have substantially swayed the jury's judgment, then the error is not harmful." *Cooper v. Taylor*, 103 F.3d 366, 370 (4th Cir. 1996).

2.

Gordon argues that the bankruptcy pleadings contain inadmissible hearsay and that the district court's instructions were insufficient to mitigate prejudice.

A criminal defendant must "be confronted with the witnesses against him." U.S. Const. amend. VI. The statements of those who do not testify at trial are generally inadmissible, unless the statement falls within an enumerated exception. Fed. R. Evid. 802. We have previously held that conversations containing both admissible material and inadmissible hearsay were properly admitted in full so that the jury could hear and comprehend the entire conversation. *United States v. Leake*, 642 F.2d 715, 720 n.6 (4th Cir. 1981).

As an initial matter, we find that Gordon's voluntary bankruptcy petition, J.A. 2195, and any filings in the bankruptcy case signed by Gordon himself are non-hearsay statements of a party-opponent. Fed. R. Evid. 801(d)(2)(A). Further, factual admissions made by Gordon through his bankruptcy lawyer, *see, e.g.*, J.A. 2494–96, 2670–84, are admissible non-hearsay because they were made by Gordon's attorney, acting as his agent, during and within the scope of the principal-agent relationship. Fed. R. Evid. 801(d)(2)(D); *see also United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986) ("Generally, statements by an attorney concerning a matter within his employment may be admissible

9

against the retaining client."); *United States v. Parsons*, 646 F.2d 1275, 1277–78 (8th Cir. 1981) (admitting bankruptcy petition prepared by attorney against the retaining client in a criminal proceeding). The district court properly admitted the allegations and requests that prompted these factual admissions to provide context to the jury. *Leake*, 642 F.2d at 720 n.6; *see also United States v. McDowell*, 918 F.2d 1004, 1007–08 (1st Cir. 1990) ("Nor can a defendant, having made admissions, keep from the jury other segments of the discussion reasonably required to place those admissions into context.").

The question of whether mixed factual and legal allegations by the trustee, and Gordon's corresponding responses, are hearsay is more complex.[3] We find that, although these items do not involve matters within Gordon's direct knowledge and may include facts asserted by Gordon's lawyer after consulting with third parties other than Gordon, J.A. 273–74, the responses were nevertheless made by Gordon's lawyer during the attorney-client relationship regarding matters within the scope of that relationship. We are therefore compelled to conclude that the statements are not hearsay under Rule 801(d)(2)(D).

While the evidence seems to us admissible on its face, the district court and the parties nevertheless appeared to concede at trial that the pleadings did contain hearsay and

---

[3] See, for example, the allegations in the Complaint to Deny Discharge of Debtors, J.A. 2571–90, and Gordon's answer to this complaint, J.A. 2591. Gordon's answer identifies the allegations as "conclusions of fact or law" and goes on to make certain legal denials; for example, "Mr. Gordon denies that he conspired to launder money . . . or engaged in conspiracy to embezzle." J.A. 2592. Absent a broad principal-agent doctrine, we could not fairly impute these denials to Gordon because they lack evidence of "[s]ome participatory role of the client [], either directly or inferentially." *United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984).

would be admitted for a limited purpose only. Therefore, we will proceed to evaluate whether, assuming for argument that the pleadings were inadmissible, the district court's decision to admit the pleadings with instruction to the jury was an abuse of discretion.

3.

We presume that a district court's curative instructions are sufficient "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citations and internal quotation marks omitted); *see also Richardson v. Marsh*, 481 U.S. 200, 208–09 (1987) (stating that juries are generally presumed to follow instructions to disregard evidence, save for a narrow exception for "facially incriminating confessions"). A key factor in determining whether curative instructions are sufficient is the temporal proximity of the instructions to the point at which the jury is exposed to inadmissible evidence. *See United States v. Chong Lam*, 677 F.3d 190, 204 (4th Cir. 2012) (finding that prompt curative instructions mitigated any prejudice from the government's improper comments at trial).

The curative instructions here, in each instance, immediately followed introduction of the bankruptcy pleadings. *E.g.*, J.A. 901. While certain curative instructions by the district court judge, standing alone, did not sufficiently explain to the jury how to weigh the bankruptcy pleadings, J.A. 267, 818, the district court provided many curative instructions and the later instructions, including the final instruction to the jury, were clear, detailed, and correctly stated the law, *e.g.*, J.A. 1610–11.

11

Therefore, we find that the district court did not abuse its discretion by admitting the bankruptcy pleadings with instruction.

4.

Assuming for argument that the district court erred and its curative instructions were insufficient, any such error was harmless because it did not influence the verdict.

There was substantial evidence implicating Gordon in fraudulent activity separate and apart from the contested bankruptcy documents. First, the very nature of the September 2012 transaction—a large deposit into Gordon's account followed by immediate withdrawals to write checks to two unrelated individuals whom Gordon had apparently never met—is strong circumstantial evidence from which the jury could infer the elements of conspiracy. *See United States v. Davey*, 661 F. App'x 240, 246 (4th Cir. 2016) (finding "circumstantial evidence regarding the nature of the transaction" relevant to whether defendant in fact intended to repay a loan).

Second, the government presented at trial evidence regarding a back-dated bridge loan agreement, a plan for Gordon's physical therapy clinic to sponsor a NASCAR team, and statements by Stevens that he obtained money from his employer to lend to Gordon. These conflicting stories are strong proof of guilt because they cast doubt on any single legitimate explanation for the September 2012 transaction.

Third, text messages between Gordon and Stevens from the fall of 2013 provide circumstantial evidence that the two were attempting to cover up the illegal nature of the September 2012 transaction. J.A. 1979–80. Further, Stevens' own testimony, which the

12

jury was free to deem credible, suggests that Gordon actually knew the funds were obtained illegally.

The trial lasted nine days, of which the government's direct case comprised over three days; the evidence briefly summarized above, standing alone and without considering the bankruptcy pleadings, was sufficient for the jury to convict Gordon on every count. Therefore, any error in admitting the bankruptcy pleadings was harmless.

**B.**

Gordon urges us to find that certain statements made by the government at trial, specifically during the government's closing argument, were plain error.

We review allegations of prosecutorial misconduct for plain error when the defendant does not object to the remarks during trial. *United States v. Umaña*, 750 F.3d 320, 351 (4th Cir. 2014). Under this standard, we will only correct an error if it is clear or obvious, affects the defendant's substantial rights, and is prejudicial. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 733–34 (1993).

When the defendant, as here, alleges that the prosecutor made improper remarks, the test is "whether the remarks were, in fact, improper, and, [] if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010).

The remarks that Gordon contends were prejudicial were in fact not improper. First, we find that the word "tainted" is sufficiently synonymous with the colloquial phrase "won't pass the smell test," such that the government's use of "tainted" to describe Stevens' testimony was proper. While the use of shorthand phrases might in some instances

13

improperly and prejudicially mischaracterize the evidence, this was not the case here. Second, Gordon testified at trial that he moved to Martha's Vineyard in order to live a simple, meager life. J.A. 1071–74. Gordon thus placed his credibility on this point at issue in the case, and opened the door to questions about his lifestyle and spending habits. *See* Fed. R. Evid. 607 ("Any party . . . may attack the witness's credibility."); Fed. R. Evid. 611(b) (stating that cross-examination may encompass "the subject matter of the direct examination and matters affecting the witness's credibility").

We find no error, let alone plain error, in the government's statements during cross-examination and closing argument.

## C.

Gordon next argues that the evidence produced at trial was insufficient to prove his knowing and willing participation in a conspiracy.

We review *de novo* the district court's denial of Gordon's motion for acquittal or, in the alternative, for a new trial. *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).

We apply a substantial evidence standard to evaluate the jury's verdict. *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018). We ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We defer to the jury's determination of witness credibility and accept any reasonable inferences that the jury drew from the evidence. *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997).

14

Gordon argues that the government failed to prove beyond a reasonable doubt that he knew the funds he obtained from Stevens were procured illegally. A reasonable juror could infer from Stevens' testimony that Gordon knew the funds were proceeds of illegal activity, but chose not to press Stevens for further information about their source because Gordon stood to profit personally from laundering the money. The jury could also infer from the back-dated loan agreement and text message conversations that Gordon knew he handled ill-gotten funds and was attempting to cover his actions.

We reject Gordon's argument that he should be held to a lower standard of investigation because Stevens was an attorney. Stevens denied that a formal attorney-client relationship existed between himself and Gordon, and the two never signed a retainer. J.A. 504. Further, the mere existence of an attorney-client relationship does not preclude criminal liability for fraud devised in the scope of that relationship, *United States v. Zolin*, 491 U.S. 554, 562–63 (1989), and the evidence was overwhelming that Gordon's transactions with Stevens extended well beyond any attorney-client relationship.

We defer to the jury whenever it draws a reasonable inference from the evidence. The evidence here was sufficient to support Gordon's convictions.

**D.**

Gordon disputes the district court's decision to give a willful blindness instruction.

We review the district court's choice of jury instructions for abuse of discretion. *United States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995). We also review for harmless error and affirm the choice of instructions when the alleged error did not influence the verdict given other evidence of the defendant's guilt. *Cooper*, 103 F.3d at 370.

15

A court may instruct on willful blindness when the defendant "knew of a high probability that a fact or circumstance existed and deliberately sought to avoid confirming that suspicion." *United States v. Poole*, 640 F.3d 114, 121 (4th Cir. 2011). The defendant's avoidance must be intentional, but may be either active or passive. *See United States v. Whittington*, 26 F.3d 456, 463 (4th Cir. 1994). "[W]here the evidence presented in the case supports both actual knowledge on the part of the defendant and deliberate ignorance, a willful blindness instruction is proper." *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996).

The evidence presented at trial supported both actual knowledge and willful blindness. If the jury concluded that Gordon lacked actual knowledge of the funds' dubious origin, they could find that he willfully avoided learning this fact by failing to ask Stevens further follow-up questions or by failing to notice obvious red flags raised by the odd nature of the transaction.

We find no abuse of discretion. Even assuming the instruction was improper, there was sufficient evidence to support actual knowledge and thus any error was harmless because it did not sway the verdict.

### E.

Gordon next contends that the government improperly subpoenaed his bankruptcy lawyer to testify before the grand jury in violation of a prior oral agreement.

When a district court denies a motion to dismiss the indictment, we review legal questions *de novo* and factual findings for clear error. *United States v. Woolfolk*, 399 F.3d 590, 594 (4th Cir. 2005).

16

Prosecutorial misconduct in grand jury proceedings is grounds for dismissing the indictment only if "'the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring)). Where, as here, a defendant challenges government actions during the grand jury process *after* being convicted at trial, our review is further circumscribed and we look only for "a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment." *United States v. McDonald*, 61 F.3d 248, 252 (4th Cir. 1995) (quoting *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 802 (1989)), *overruled on other grounds by United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000). We also analyze the alleged grand jury misconduct for harmless error. *Bank of Nova Scotia*, 487 U.S. at 255–56.

Prior to Gordon's indictment, the government notified Gordon's defense counsel that it intended to subpoena his bankruptcy attorney, John Schropp ("Schropp"), to testify before the grand jury. The government then proceeded to subpoena Schropp without further notice to Gordon. Gordon argues that the government's failure to provide additional notice breached a promise that the original Assistant U.S. Attorney assigned to his case had made to Gordon's defense counsel.

Gordon does not allege bad faith by the government (because the failure was due to a changeover in the prosecution team), J.A. 94–95, and also cannot claim that he was denied the right to be heard on the issue of whether Schropp's testimony was protected by

17

the attorney-client privilege. *See Zolin*, 491 U.S. at 572–74 (stating that, once the party opposing privilege establishes a factual basis for the crime-fraud exception, the court may determine admissibility *in camera* at its own discretion); *In re Grand Jury Proceedings, Thurs. Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 350–53 (4th Cir. 1994) (noting that the government may make an initial showing that the privilege does not apply *ex parte* and *in camera*, and that the party invoking the privilege has no due process right to a hearing).

Because Gordon had no constitutional right to contest the applicability of the crime-fraud exception before the grand jury heard Schropp's testimony, we find the government's breach of its promise to notify did not create a fundamental defect in the grand jury proceedings or influence the decision to indict. We further find, in the alternative, that any error was harmless because Gordon has presented no evidence that the district court erred in its substantive determination of whether Schropp's testimony fell within the crime-fraud exception to the attorney-client privilege. Therefore, the district court's denial of Gordon's motion to dismiss the indictment was not clearly erroneous and will be affirmed.

## III.

For the reasons stated above, we affirm the judgment of the district court.

*AFFIRMED*